**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-7313**

ELBERT SMITH,

        Plaintiff - Appellant,

      v.

DENNIS COLLINS; ANTHONY GILBERT; RICHARD LIGHT; LESLIE
FLEMING; MARCUS ELAM,

        Defendants - Appellees.

Appeal from the United States District Court for the Western District of Virginia, at
Roanoke, James P. Jones, District Judge.  (7:17-cv-00215-JPJ-RSB)

Argued:  April 24, 2020                          Decided:  July 10, 2020

Before GREGORY, Chief Judge, and FLOYD and THACKER, Circuit Judges.

Vacated and remanded by published opinion.  Judge Floyd wrote the opinion in which
Chief Judge Gregory and Judge Thacker joined.

**ARGUED:**  Noah McCullough, GEORGETOWN UNIVERSITY LAW CENTER,
Washington, D.C., for Appellant.  Martine Elizabeth Cicconi, OFFICE OF THE
ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia for Appellees.  **ON
BRIEF:** Erica Hashimoto, Director, Nicolas Sansone, Supervising Attorney, Ariel Dukes,
Student Counsel, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW
CENTER, Washington, D.C., for Appellant.  Mark R. Herring, Attorney General, Victoria
N. Pearson, Deputy Attorney General, Margaret Hoehl O'Shea, Assistant Attorney
General, Laura Haeberle Cahill, Assistant Attorney General, Toby J. Heytens, Solicitor

General, Michelle S. Kallen, Deputy Solicitor General, Jessica Merry Samuels, Assistant Solicitor General, Zachary R. Glubiak, John Marshall Fellow, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

———————

FLOYD, Circuit Judge:

Plaintiff-Appellant Elbert Smith spent over four years in solitary confinement at Wallens Ridge State Prison, a supermax correctional facility within the Virginia Department of Corrections (VDOC). In 2017, while Smith was housed in administrative segregation, he filed this pro se lawsuit against various correctional officials under 42 U.S.C. § 1983, alleging a violation of his procedural due process rights. The district court eventually granted summary judgment to these officials on the ground that Smith had failed to establish a protected liberty interest. According to the district court, the conditions that Smith was forced to endure in administrative segregation were not, as a matter of law, "atypical and significant[ly] [harsh] . . . in relation to the ordinary incidents of prison life." *Smith v. Collins*, No. 7:17-cv-00215, 2018 WL 4515898, at \*5 (W.D. Va. Sept. 20, 2018) (quoting *Sandin v. Connor*, 515 U.S. 472, 484 (1995)).

Viewing the evidence in the light most favorable to Smith, we think a reasonable jury could disagree. In line with the Supreme Court's decision in *Wilkinson v. Austin*, 545 U.S. 209 (2005), our atypical-and-significant-hardship analysis turns on three factors: "(1) the magnitude of confinement restrictions; (2) whether the administrative segregation is for an indefinite period; and (3) whether assignment to administrative segregation had any collateral consequences on the inmate's sentence." *Incumaa v. Stirling*, 791 F.3d 517, 530 (4th Cir. 2015). Here, Smith has presented evidence demonstrating that his confinement conditions were severe in comparison to those that exist in general population (factor one) and that his segregation status may have had collateral consequences relating to the length of his sentence (factor three). Moreover, although the duration of Smith's

3

segregated confinement—a fact we consider in assessing indefiniteness (factor two)—is not as long as the substantial periods of segregated confinement that this Court has found sufficient to support a protected liberty interest in the past, prisoners need not languish in solitary confinement for decades on end in order to possess a cognizable liberty interest under the Due Process Clause of the Fourteenth Amendment. The four-plus years that Smith spent in administrative segregation is significant enough to tip the scales in his favor, particularly in light of the other evidence of indefiniteness that he relies upon in this case.

For these reasons, we hold that there is at least a genuine dispute of material fact as to whether Smith's conditions of confinement imposed a significant and atypical hardship in relation to the ordinary incidents of prison life. Therefore, we vacate the district court's summary judgment order and remand the case for further proceedings consistent with this opinion. Specifically, on remand, the district court should consider in the first instance, and after further discovery, whether the process that Smith received was constitutionally adequate and whether the Defendant-Appellees are nevertheless entitled to qualified immunity.

## I.

Smith is currently serving a forty-four-year sentence in VDOC custody. In November 2010, he was placed in VDOC's Grooming Standards Violators Housing Unit (VHU), which was then located at Keen Mountain Correctional Center. Until recently, VDOC's grooming policy, Operating Procedure (OP) 864.1, required prisoners to keep their hair above a certain length or be moved to some form of alternative segregated

housing, such as the VHU. *See* J.A. 124–27, 177–79; *see also* Resp. Br. 10 n.4 (detailing 2019 policy changes to OP 864.1). Smith asserts that, as a practicing Rastafarian, he cannot cut his hair without violating his religion.

Several months later, in February 2011, Smith was transferred to Wallens Ridge State Prison on an emergency basis, after he was accused of assaulting a correctional officer at Keen Mountain. Wallens Ridge is one of VDOC's twin maximum-security facilities with segregation units for holding prisoners in long-term solitary confinement. Upon arrival, Smith was assigned a "Level S" security level—a special designation reserved for prisoners who must be managed in an administrative segregation[1] setting due to a security risk. Certain kinds of past acts are segregation qualifiers, and aggravated assault against a correctional officer is one of them.

Shortly after he was assigned to Level S, Smith was transferred to VDOC's other supermax facility, Red Onion State Prison, for intake, orientation, and assessment, and he remained in administrative segregation there until his transfer back to Wallens Ridge in July 2013. In mid-2012, a little more than a year after Smith arrived at Red Onion, he began participating in an earlier version of VDOC's "Segregation Reduction Step-Down Program," which is now memorialized in OP 830.A. *See generally* J.A. 74–93 (OP 830.A). Because the Step-Down Program lies at the heart of Smith's appeal, we briefly summarize

---

[1] Administrative segregation is to be distinguished from disciplinary segregation. Administrative segregation is not punishment for disciplinary infractions; rather, it is used to protect staff and other prisoners and to maintain order within the prison.

5

it before addressing Smith's experience in the program at both Red Onion and Wallens Ridge.

A.

The stated purpose of the Step-Down Program is to "establish[] procedures for incentive[-]based offender management" that will create a "pathway" for prisoners housed in segregation "to step-down from Security Level S to lower security levels in a manner that maintains public, staff[,] and offender safety." J.A. 74. Per OP 830.A, upon completion of the intake and orientation process at Red Onion, Level S prisoners are placed on one of two pathways by a "Dual Treatment Team"[2] based on their identified risk level: Intensive Management (IM) or Special Management (SM). J.A. 76. Depending upon whether they choose to participate in the Step-Down Program,[3] prisoners may then be assigned a "privilege status" within their respective pathways. J.A. 76. Offenders in the IM track can be classified as IM0, IM1, or IM2—with IM0 offenders receiving the fewest privileges and having the most restrictive conditions. The same is true for SM offenders.

---

[2] The Dual Treatment Team is headed by "Evidence Based Practice Managers" who represent both Red Onion and Wallens Ridge, and it consists of at least a Unit Manager, an Institutional Program Manager, an Intelligence Officer, a Qualified Mental Health Professional, a Facility Medical Director, a Counselor, and a Corrections Officer. J.A. 74.

[3] Although OP 830.A frames the decision to participate in the Step-Down Program as a choice, *see* J.A. 76 ("At the completion of the Intake/Orientation process, offenders will be . . . [a]ssigned to a privilege status depending on whether they have committed to participate in the step-down program or refused to participate . . . ."), we note that the evidence submitted by Defendants in support of summary judgment strongly suggests that the Step-Down Program is the *only* mechanism through which prisoners may be released back to general population.

6

Upon successful completion of the requirements of IM1 and IM2 or SM1 and SM2, offenders can be stepped down to Security Level 6 (SL6). For SM pathway prisoners like Smith, who present less of a security risk, *see generally* J.A. 74–75 (defining IM and SM pathways), the transition from SL6 to general population at Security Level 5 (SL5) occurs in two phases: the first allows prisoners slightly more freedom, and the second provides limited interaction with other prisoners.

Step-Down Program participants are "challenged to meet goals in three areas." J.A. 78. They must commit to (1) eliminating disciplinary infractions, (2) meeting a set of responsible behavior goals, and (3) participating in self-improvement and education programs, including a seven-part curriculum called the *Challenge Series*. Members of a "Unit Management Team"—a multi-disciplinary group comprised of corrections officers, counselors, and a unit manager—are charged with informally tracking participants' progress and advancing them through the IM or SM pathway. *See* J.A. 75, 78. In addition to monitoring participants' disciplinary charges, the Unit Management Team tracks each participant's progress toward responsible behavior and program participation both by rating their weekly performance in categories such as cell maintenance, personal hygiene, standing for count, and respect, and by rating their level of participation in weekly programming.

All told, if a prisoner earns positive weekly ratings and evaluators find that he meets the goals of his current step, then he may advance to the next step and earn its additional privileges. But prisoners who do not meet their goals, or who commit disciplinary infractions, may be moved back a step or required to redo a *Challenge Series* workbook.

7

As previously noted, prisoners who successfully complete the IM or SM pathway may be eligible to "step down" from Level S to SL6 and, eventually, to general population at SL5. Before advancing to SL6, however, they must be "formally reviewed" by an Institutional Classification Authority (ICA) in accordance with VDOC's "Facility Classification Management" policy, OP 830.1. J.A. 78; *see* J.A. 94–102 (OP 830.1). OP 830.1 applies to *all* Level S prisoners and provides for ninety-day reviews of a person's segregation status at a hearing before an ICA.[4] *See* J.A. 72; *see also* J.A. 96 (defining ICA as a "facility employee who has contact with the offender, but who is impartial to the offender being presented for review"). A counselor is also present at the hearing. *See* J.A. 96–97, 242. Following each hearing, the ICA makes a recommendation that is then reviewed by the "Facility Unit Head" (presumably, the Warden) or their designee. J.A. 99. When the recommendation of the ICA is that an IM2 or SM2 prisoner be stepped down to SL6, the Step-Down Program policy (OP 830.A) provides more specific guidance and requires that the Dual Treatment Team review the ICA's recommendation before proceeding to the Warden for a final decision. J.A. 78–79.

---

[4] There are several other procedures that ostensibly apply to all Level S prisoners, even though they are contained in OP 830.A (the Step-Down Program policy), rather than OP 830.1. *See, e.g.*, J.A. 82 (providing for annual review of Level S assignment by an external review team in OP 830.A); J.A. 82–83 (tasking Dual Treatment Team in OP 830.A with advising Regional Administrator and Warden if it believes that an offender no longer meets the "Level S" criteria).

B.

Once Smith began participating in the Step-Down Program at Red Onion in 2012, he quickly advanced from SM0 to SM1. Although an ICA recommended that Smith be advanced to SM2 in June 2013, that recommendation was not approved due to Smith's purported failure to comply with VDOC's grooming policy. *See* J.A. 208. About a month later, on July 20, 2013, Smith completed the seven-workbook *Challenge Series*. J.A. 9.

As relevant here, Smith was transferred from Red Onion to Wallens Ridge on July 30, 2013. *See generally* J.A. 78 (explaining that "SM offenders" who complete intake and orientation at Red Onion and demonstrate satisfactory participation in the Step-Down Program may be assigned to SM1 or SM2 and will either be retained at Red Onion or transferred to Wallens Ridge). Because he was still designated as a Level S prisoner, he was immediately placed in administrative segregation.

C.

Smith remained in administrative segregation at Wallens Ridge for over four years, until his transfer back to Red Onion in October 2017. As we explain below, it is this period of confinement that led Smith to file suit under 42 U.S.C. § 1983.

Despite his earlier progress to SM1 at Red Onion, Smith's ICA hearing reviews from Wallens Ridge reveal that during his first two-and-a-half years there, he was merely deemed an appropriate "segregation" candidate, without any reference to his step level within the Step-Down Program. *See* J.A. 211 (Dec. 2013); J.A. 214 (March 2014); J.A. 215 (June 2014); J.A. 216 (Sept. 2014); J.A. 217 (Dec. 2014); J.A. 219 (March 2015); J.A.

9

220 (Aug. 2015); J.A. 221 (Oct. 2015); *cf.* J.A. 202–04, 206–08 (Smith's earlier ICA hearing reviews at Red Onion documenting his progression in the SM pathway). It was not until February 2016—after Smith apparently started to formally inquire about how to "get [his] pathway," J.A. 223—that the Wallens Ridge reviews began listing Smith's step level. *But see* J.A. 211, 216, 219 (noting, in several pre-February 2016 reviews, that Smith expressed a desire to be transferred to the VHU at Wallens Ridge). And even then, Smith was designated as SM0, one step lower than the SM1 step that he had achieved at Red Onion. J.A. 223.

Like many of the preceding reviews and ones yet to come, the February 2016 review cited the need for a "longer period of stable adjustment" as justification for the ICA's recommendation that Smith either remain in segregation or at an SM0 status. J.A. 223; *see also, e.g.*, J.A. 214, 230. Moreover, in every subsequent ninety-day review until Smith's ultimate transfer back to Red Onion in October 2017, the ICA cited Smith's noncompliance with the grooming policy as a reason for denying his progress in the Step Down Program. *See* J.A. 224–26, 228 (Apr., July, Oct., and Dec. 2016); J.A. 229–31 (Mar., June, and Aug. 2017). At each of these hearings, Smith asked about "a pathway . . . out of segregation," *see, e.g.*, J.A. 231, and on at least one occasion, he reiterated his desire to be transferred to the VHU, *see* J.A. 225.

Unit Manager Dennis Collins and Lieutenant Richard Light were among Smith's ICAs at Wallens Ridge. Anthony Gilbert, who served as Smith's counselor, assisted Gilbert and Light by attending the cell-side ICA hearings and making recommendations regarding Smith's demonstrated behavior and program participation. J.A. 242; *see also*

J.A. 97. On several occasions, Collins and Light served as their own "administrative reviewers" and thus approved their own ninety-day recommendations, in violation of VDOC policy. *See* J.A. 99. Smith grieved these violations, and on each occasion, VDOC officials agreed that the self-reviews violated department policy. Still, they provided no relief. Leslie Fleming, the Wallens Ridge Warden, reviewed and denied Smith's internal appeals, and VDOC Regional Administrator Marcus Elam signed off on Fleming's resolution of those appeals.

During his nearly four-and-a-half years in administrative segregation at Wallens Ridge, and for over two years prior at Red Onion, Smith was confined in highly restrictive conditions. Smith attests that: (1) he was confined alone in a nine-by-fourteen-foot cell for twenty-four hours per day on non-recreation and non-shower days; (2) he was only permitted to leave his cell for showers three times per week and for recreation in an eight-by-fourteen-foot fenced cage five times per week, though recreation was frequently cancelled; (3) each time he left his cell, he was subjected to a highly invasive strip search, and he remained in shackles; (4) he was required to eat his meals alone in his cell; (5) almost all human contact was prohibited; (6) any visitation opportunities were conducted through glass walls, and he was limited to two brief phone calls per month; (7) his cell door was solid metal and outfitted with metal strips to prevent communication with other prisoners; (8) the lights remained on in his cell at all times, dimming only at night, and he faced further discipline if he attempted to cover the light in an effort to sleep; and (9) he was unable to participate in rehabilitation programs. As a result of these conditions, Smith attests that he was "suffering from untreated mental health issues, due to

11

being isolated in segregation for so long." J.A. 162. He also claims that he was denied the ability to accrue good-time credits while in administrative segregation.

Smith was transferred back to Red Onion in October 2017, several months after he initiated this lawsuit. *See infra* Part II. In December 2017, Red Onion officials changed Smith's status from SM0 to SL6—a three-step jump that took him all the way from the most severe form of segregated confinement to the initial stages of non-segregation. Eventually, Smith was transferred to a lower-security facility, where he remains to date. *See* J.A. 314 (notice of change of address dated July 22, 2019).

## II.

In May 2017, while still housed in administrative segregation at Wallens Ridge, Smith filed this pro se lawsuit under 42 U.S.C. § 1983. As Defendants, Smith named Unit Manager Collins, Lieutenant Light, Counselor Gilbert, Warden Fleming, and VDOC Regional Administrator Elam (collectively, "Defendants"). In his verified Complaint, Smith alleged that Defendants deprived him of his constitutional guarantee of due process by keeping him in administrative segregation without meaningful review and with no pathway for release. As relief, Smith sought a declaration that Defendants violated his procedural due process rights, as well as an injunction ordering Defendants to move him out of segregation at Wallens Ridge, to restore good time credits that he had been denied as a result of his Level S status, and to provide him with mental health treatment. *See* J.A. 16–17. Smith also sought damages from each Defendant. J.A. 16.

12

In October 2017, around the time of Smith's transfer from Wallens Ridge to Red Onion, Defendants filed an answer, and the case was placed on an expedited schedule by a magistrate judge. The magistrate judge's order gave Defendants three weeks to move for summary judgment.

A flurry of discovery requests by Smith followed. Defendants moved for summary judgment on November 17, 2017, the deadline set by the magistrate judge, without responding to Smith's discovery requests. Shortly thereafter, Defendants moved for a protective order staying all discovery pending resolution of their summary judgment motion.

Still pro se, Smith opposed Defendants' motion for summary judgment, in part because he had not yet been given an opportunity to conduct discovery. A few weeks later, the district court denied Defendants' motion for a protective order and ordered them to file responses or objections to Smith's discovery requests by January 5, 2018, at which point it would permit Smith to supplement his opposition to Defendants' motion for summary judgment.

Defendants complied, and so did Smith. In his additional response to Defendants' summary judgment motion, Smith emphasized his need to conduct further discovery to prove that Defendants conducted "sham reviews" and barred him from progressing in the Step-Down Program. And in the months that followed, Smith filed discovery request after discovery request, and eventually moved to compel discovery. A magistrate judge summarily denied Smith's motion without prejudice in April 2018; in the magistrate's

13

view, such discovery was unnecessary to respond to the pending summary judgment motion.

The district court granted Defendants' motion for summary judgment on September 20, 2018. In doing so, the district court relied primarily on Smith's failure to establish any genuine dispute of material fact as to the atypicality and hardship of the conditions of segregated confinement for SM pathway prisoners like Smith, and thus as to the existence of a protected liberty interest for purposes of Smith's procedural due process claim. *See Smith*, 2018 WL 4515898, at *5–7; *see also Wilkinson*, 545 U.S. at 222–23 (explaining that "the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement" is whether such conditions impose an "'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life'" (quoting *Sandin*, 515 U.S. at 484)). The district court also held that to the extent the Complaint could be construed to raise a procedural due process claim challenging Smith's initial classification as a Level S offender, Defendants were entitled to judgment as a matter of law on that claim because the relevant statute of limitations had run. *Smith*, 2018 WL 4515898, at *4.

Smith timely appealed, and he was later appointed counsel by this Court. Through his counsel, Smith clarifies that on appeal, he only presses "individual capacity damages claims against defendants for their role in leaving him in ongoing and severe conditions of segregated confinement without providing a genuine pathway for relief." Opening Br. 22. Thus, neither the initial-classification claim that the district court read into Smith's

Complaint, nor Smith's initial request for injunctive relief—which has been mooted by his subsequent transfer out of segregation—remain in issue.

## III.

"We review a district court's grant of a motion for summary judgment de novo, applying the same legal standards as the district court." *Nader v. Blair*, 549 F.3d 953, 958 (4th Cir. 2008). A district court should award summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, we "view all reasonable inferences drawn from the evidence in the light that is most favorable to the non-moving party," here, Smith. *Nader*, 549 F.3d at 958.

## IV.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV § 1. To establish a procedural due process violation, Smith must satisfy a two-part test. First, he must demonstrate that he had a protected liberty interest in avoiding solitary confinement as a "Level S" prisoner in the Step-Down Program at Wallens Ridge. *See Incumaa*, 791 F.3d at 526. Second, he must prove that Defendants failed to afford him minimally adequate process to protect that liberty interest. *See id.*

As discussed, in granting summary judgment to the defendants in this case, the district court held that Smith failed to establish a protected liberty interest—the first prong

15

of the procedural due process analysis—as a matter of law. Because Smith is a convicted prisoner, he does not have an inherent, constitutionally protected liberty interest in release from solitary confinement. *See Prieto v. Clarke*, 780 F.3d 245, 248–52 (4th Cir. 2015). Thus, he must identify a state-created liberty interest in avoiding solitary confinement. *Id.* at 248 & n.2. To do so, he must be able to show two things: first, that there is "a basis for an interest or expectation in state regulations" for avoiding such confinement, and second, that the conditions "'impose[] atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" *Id.* at 249–50 (quoting *Sandin*, 515 U.S. at 484).

The district court held that the first requirement of prong one was satisfied because VDOC policy provides for a security-level review for Level S prisoners in the Step-Down Program every ninety days, *Smith*, 2018 WL 4515898, at \*5, and Defendants do not challenge that conclusion on appeal, Resp. Br. 30 n.10; *see also Incumaa*, 791 F.3d at 527 (finding state prison policy requiring thirty-day, administrative-segregation review created potential liberty interest). Instead, the parties' dispute centers on the second requirement— namely, whether the conditions of Smith's confinement as a Level S prisoner failed to constitute an atypical and significant hardship as a matter of law, as the district court held. *See Smith*, 2018 WL 4515898, at \*5–6.

"Whether confinement conditions are atypical and substantially harsh 'in relation to the ordinary incidents of prison life' is a 'necessarily . . . fact specific' comparative exercise." *Incumaa*, 791 F.3d at 527 (alteration in original) (quoting *Beverati v. Smith*, 120 F.3d 500, 502–03 (4th Cir. 1997)). In this case, we must compare the conditions in

16

administrative segregation at Wallens Ridge[5] to the "ordinary incidents of prison life," which, for Smith, means the conditions in general population. *See id.* Only if Smith proves that his confinement constituted an "atypical and significant hardship" in relation to that general-population norm will he succeed in establishing a protected liberty interest. *See id.* at 529.

Drawing on the Supreme Court's reasoning in *Wilkinson*, this Court has construed the atypical-and-significant-hardship analysis as turning on primarily three factors: "(1) the magnitude of confinement restrictions; (2) whether the administrative segregation is for an indefinite period; and (3) whether assignment to administrative segregation had any collateral consequences on the inmate's sentence." *Incumaa*, 791 F.3d at 530; *see Wilkinson*, 545 U.S. at 221, 224. Applying those factors here, we conclude that Smith has at least demonstrated a genuine issue of material fact with regard to the atypicality and harshness of his confinement in administrative segregation at Wallens Ridge, and thus as to the existence of a liberty interest in avoiding such confinement.

---

[5] As discussed, on appeal, Smith only presses individual-capacity damages claims against Defendants for leaving him in ongoing and severe conditions of segregated confinement at Wallens Ridge without providing a genuine pathway for release. For this reason, and because we think that Smith's stint in administrative segregation at Wallens Ridge alone is sufficient to trigger a dispute of material fact as to the existence of a liberty interest, *see infra* Part IV.B, we focus exclusively on Wallens Ridge in this opinion, even though the segregated conditions at both facilities were essentially the same for Smith.

A.

The first *Wilkinson* factor weighs strongly in Smith's favor. The severity of the conditions alleged by Smith in his verified Complaint and affidavit opposing summary judgment are substantially similar to those that contributed to the finding of a protected liberty interest in the Supreme Court's decision in *Wilkinson* and this Court's decision in *Incumaa*. *See Wilkinson*, 545 U.S. at 214, 223–24; *Incumaa*, 791 F.3d at 521–22, 531.

The conditions in the state supermax facility at issue in *Wilkinson* were "synonymous with extreme isolation," and nearly "every aspect" of prisoners' lives were controlled and monitored. 545 U.S. at 214. For example, "almost all human contact [was] prohibited," *id.* at 223, even to the point that "solid metal doors with metal strips along their sides and bottoms" prevented conversation from "cell to cell," *see id.* at 214, 223–24, and all meals were taken "alone in the inmate's cell instead of in a common eating area," *id.* at 214. Opportunities for visitation were "rare" and "in all events [were] conducted through glass walls." *Id.* at 214. The *Wilkinson* plaintiffs were also "deprived of almost any environmental or sensory stimuli" at the supermax facility. *Id.* They were required to remain in their cells, which measured seven-by-fourteen feet, for twenty-three hours per day, *id.*, and even the one-hour daily exercise period took place in a "small indoor room," *id.* at 224. Finally, though the light in their cells could be dimmed, it remained on at all times. *Id.* at 224.

In *Incumaa*, this Court held that a prisoner confined in the Special Management Unit (SMU) of a South Carolina prison had likewise endured "severe" confinement conditions. *See* 791 F.3d at 531. In doing so, we explained that "[i]n many respects," the "severely

18

restrictive and socially isolating" circumstances of Incumaa's incarceration in the SMU "mirror[ed] the experience of the *Wilkinson* inmates in Ohio's Supermax facility." *Id.* Indeed, we observed that conditions in the SMU may, in fact, have been "worse." *Id.* Unlike the *Wilkinson* plaintiffs, Incumaa was subjected to a "highly intrusive strip search every time he [left] his cell." *Id.* And the severity of these conditions in relation to the conditions in general population, when combined with the extraordinary duration and indefiniteness of Incumaa's confinement in the SMU, led us to conclude that Incumaa had "demonstrated a liberty interest in avoiding solitary confinement in security detention." *Id.* at 532.

If the *Wilkinson* conditions now sound familiar, it is likely because Smith has presented evidence demonstrating that he was subject to many of those same conditions. *See generally supra* p. 11. Indeed, like the plaintiff in *Incumaa*, Smith has shown that the circumstances of his confinement in administrative segregation at Wallens Ridge may have been worse in some respects, due to the highly intrusive search.

Notably, the district court here acknowledged that the conditions of administrative segregation at Wallens Ridge were "highly restrictive." *Smith*, 2018 WL 4515898, at *1, *5. Nevertheless, it found that these conditions were not atypical or significantly harsh for primarily three reasons. First, it held that the "mere existence" of highly restrictive conditions is insufficient to establish atypicality, "because general population inmates can expect temporary terms in segregated confinement under similar restrictions." *Id.* at *5; *see Sandin*, 515 U.S. at 486 (thirty days in disciplinary segregation not atypical); *Beverati*, 120 F.3d at 504 (six months in administrative segregation not atypical). Second, the district

19

court observed that in many ways, Smith's conditions "approximate[d] conditions for general population inmates." *Smith*, 2018 WL 4515898, at *6. For example, the court noted that Level S prisoners (a) "have access to hygiene and legal materials, telephone usage, legal counsel, medical and mental health care, library books, commissary items, ingoing and outgoing mail services, and the grievance procedure"; (b) "may possess property items, including religious materials, in their cells"; and (c) "receive regular meals, laundry services, and visitation opportunities." *Id.* Third, the district court reasoned that Smith's evidence did not demonstrate the type of "prolonged, extreme deprivation of sensory stimuli or social contact that gave rise to the concerns" in *Wilkinson* and *Incumaa*, because OP 830.A "requires staff to conduct frequent and detailed reviews of each Level S inmate's status and communicate with him about those reviews and his progress." *Id.*

We disagree with the district court's analysis on all three fronts. The first rationale is unconvincing from a severity perspective: Expectations held by general-population prisoners about any potential temporary term in highly restrictive segregation conditions have no bearing on the first *Wilkinson* factor, as that factor evaluates the severity of the segregation conditions themselves. Moreover, this rationale begs the question whether Smith's confinement in administrative segregation was "temporary," rather than indefinite, for purposes of the second *Wilkinson* factor. *See Smith*, 2018 WL 4515898, at *5; *see also infra* Part IV.B (explaining why the duration of Smith's confinement in administrative segregation, which lasted longer than the thirty-day and six-month periods in *Sandin* and *Beverati*, respectively, actually helps tip the scales in his favor).

20

The district court's second rationale falls flat too. Indeed, it represents the type of "point-by-point comparison" that we have expressly held is not required under *Wilkinson*. *See Incumaa*, 791 F.3d at 530 (explaining that *Wilkinson* did not engage in a point-by-point comparison of the conditions in the state's supermax facility and the ordinary incidents of prison life); *see also id.* at 531 (merely observing that the administrative-segregation conditions were "significantly worse" than the general-population conditions).

The district court's third and final rationale, which is premised on the review procedures enshrined in VDOC's Step-Down Program policy, is also wide of the mark. The fact that VDOC policy contemplates communication between staff and Step-Down Program participants hardly mitigates the seriousness of the deprivation of social stimuli that prisoners like Smith experience in administrative segregation. We have never heard of a prison that manages itself. Correctional staff do not obviate the need for social interaction by performing their most basic duty—checking in on the welfare and ensuring the safety of prisoners.

B.

Because the severity of the conditions alone are insufficient to create a liberty interest, *see Wilkinson*, 545 U.S. at 224, we turn next to indefiniteness. In *Wilkinson*, the Supreme Court held that the plaintiffs' interest in receiving meaningful procedural review was magnified because they were confined to a supermax facility for an indefinite period. *See id.* Accordingly, courts have looked to the indefiniteness of solitary confinement, as

21

well as its duration, in determining whether prisoners have a sufficient liberty interest in avoiding such confinement. *See Incumaa*, 791 F.3d at 531.

Critically, even though VDOC's Step-Down Program is designed to provide Level S prisoners with a pathway out of segregation, Smith asserts that the Program did not provide *him* with a viable path to release. Recall that after Smith completed the *Challenge Series* in 2013, he advanced to SM1 at Red Onion. But at Wallens Ridge, his progress was stalled for over four years. Indeed, Smith somehow reverted back to SM0 upon arrival at Wallens Ridge, and he never advanced past that step until his return to Red Onion in late 2017. One of three rationales, or a combination of them, was always cited in denying Smith progress in the Step-Down Program at Wallens Ridge: (1) Smith violated the grooming policy; (2) Smith was simply appropriate for segregation or should remain there; or (3) Smith needed a longer period of stable adjustment. The conclusory nature of the latter two rationales could lead a reasonable jury to find that the ICA reviews did not offer Smith any real opportunity for release from segregation. Thus, the parties appropriately home in on the significance of the first rationale—Smith's failure to comply with VDOC's grooming policy—for purposes of indefiniteness.

Defendants argue that Smith's confinement in administrative segregation was not truly indefinite because he was in control of his own fate; by refusing to comply with the grooming policy, he effectively chose not to progress through the Step-Down Program. Smith, on the other hand, says that compliance with the grooming policy was no path out of segregation at all, given his status as a religious objector. We agree with Smith. Defendants' only rejoinder is premised on Smith's failure to assert a claim under the

22

Religious Land Use and Institutionalized Persons Act (RLUIPA) or Free Exercise Clause in his Complaint. Yet whether Smith has a meritorious RLUIPA[6] or Free Exercise claim is beside the point. The point is that Smith's status as a religious objector makes the "choice" of complying with the grooming policy a non-choice, at least for purposes of assessing indefiniteness.[7]

The duration of Smith's confinement in administrative segregation at Wallens Ridge strengthens his evidentiary showing of indefiniteness. To be sure, Smith's period of segregated confinement is quite shy of the twenty-year period at issue in *Incumaa*. *See* 791 F.3d at 531. But four years and three months is far longer than the thirty-day period at issue in *Sandin*, *see* 515 U.S. at 486, and the six-month period at issue in this Court's decision in *Beverati*, *see* 120 F.3d at 504. It also exceeds the length of various periods that

---

[6] *See generally Greenhill v. Clarke*, 944 F.3d 243, 252 (4th Cir. 2019) (holding same VDOC grooming policy imposed substantial burden on religious exercise, and remanding for a least-restrictive-means determination).

[7] In reaching a different conclusion, the district court emphasized that the procedural protections embodied in the Step-Down Program prevented Smith's confinement from "falling into the category of indefinite isolation identified in *Wilkinson* and *Incumaa* as triggering constitutional due process protections." *Smith*, 2018 WL 4515898, at *6. But that line of reasoning proves too much if a reasonable jury could infer that, in practice, those procedures were not followed and that the reviews were a sham. Moreover, the district court did not address the conclusory nature of the "remain in segregation" and "needs longer period of stable adjustment" rationales. And although it did briefly acknowledge Smith's refusal to comply with VDOC's grooming standards as a reason for his continued assignment to Level S status, its explanation for disregarding the grooming-policy rationale was misguided. In particular, the district court explained that the grooming policy was the same one that applies to prisoners in general population, and thus could not support a finding of atypicality. Whatever truth that explanation may or may not have when it comes to comparing the *conditions* of confinement in segregation and general population, it is irrelevant to the *indefiniteness* inquiry in this case.

23

other courts have found insufficient to trigger a liberty interest, which "range[] up to two and one-half years." *See Wilkerson v. Goodwin*, 774 F.3d 845, 855 (5th Cir. 2014) (citing cases).

Given the "wide range of psychological scars" that solitary confinement "imprints on those that it clutches," *Apodaca v. Raemisch*, 139 S. Ct. 5, 9 & n.8 (2018) (statement of Sotomayor, J., respecting the denial of certiorari); *see also Davis v. Ayala*, 135 S. Ct. 2187, 2210 (Kennedy, J., concurring) (describing the "terrible price" exacted by "[y]ears on end of near-total isolation"), we have little trouble concluding that four-plus years in solitary confinement is significant enough to tip the indefiniteness factor in Smith's favor, particularly when coupled with the foregoing ICA hearing review evidence that we must view in the light most favorable to Smith. Accordingly, we need not address Smith's contention that we must consider his *entire* period of confinement in administrative segregation at both Wallens Ridge and Red Onion. *See* Opening Br. 5 n.3, 33–34 & n.9 (insisting that because atypical and significant hardship "examines segregation's effects on inmates," and because Defendants "knew [that] Smith had been in segregation at Red Onion for a lengthy time before his transfer to Wallens Ridge," the Court should consider his entire six-year period in segregation, even though he only sues Wallens Ridge officers individually for damages).

Defendants offer one final argument in furtherance of their position that Smith's confinement in administrative segregation was definite, but we are not persuaded. Because Smith was eventually released from segregation via the Step-Down Program, Defendants assert that we cannot compare him to the plaintiffs in *Wilkinson* and *Incumaa*, whose

24

confinement in segregation was ongoing. They are wrong. For one thing, Smith was only able to achieve progress in the Step-Down Program after he filed this lawsuit. For another, it was only after Smith was transferred to another prison (Red Onion), and came under the control of different officials, that he progressed in the Program and eventually secured release from segregation. And even then, the reasons cited for his three-step jump from SM0 to phase one of SL6 were based on his completion of the *Challenge Series*, J.A. 235, which he completed *over four years earlier* during his initial stint at Red Onion, J.A. 9. Thus, at least in this case, we refuse to consider Smith's post-litigation release as weighing against a finding of indefiniteness.

In sum, we conclude that the three rationales cited throughout Smith's ICA hearing reviews, when taken together, at least establish a genuine issue of fact as to the existence of a viable pathway out of segregation for Smith, especially when coupled with the record evidence of duration. Because indefiniteness is one of the factors that we must consider in assessing the atypicality and harshness of a prisoner's confinement in administrative segregation, this fact is plainly material to Smith's procedural due process claim.

C.

That leaves the third factor: "whether assignment to administrative segregation had any collateral consequences on the inmate's sentence." *Incumaa*, 791 F.3d at 530. In *Wilkinson*, the "collateral consequences" took the form of parole ineligibility. *See* 545 U.S. at 224. Here, Smith points to his inability to earn good-time credits as a collateral consequence of his stalled progress in the Step-Down Program.

25

VDOC assigns prisoners one of four good-time credit class levels, with Level I accruing the most credits and Level IV accruing none. *See* OP 830.3, *available at* https://vadoc.virginia.gov/files/operating-procedures/800/vadoc-op-830-3.pdf (saved as ECF Opinion attachment).[8] Defendants accept that depriving someone of good-time credits is a collateral consequence, and they concede that Smith was ineligible to progress to Level I while in segregation. Nevertheless, they argue that Smith was not affected by such ineligibility because he never ascended to Level III or Level II, and so could not have reached Level I.

We easily reject Defendants' argument, as it fails to capture how Smith's stagnated progress in the Step-Down Program may have caused his stagnation in class level for good-time credit purposes. While Smith does not appear to have been eligible to progress past Level IV until sometime in early 2015,[9] he was continually denied an increase in class level after that time, despite zero infractions. The reasons given were the same: Smith had failed to "complete[] any treatment programs during the review period," "did not [have] a job title," and was "out of compliance with the grooming standard." J.A. 222 (Dec. 2015);

---

[8] Although the cited policy did not become effective until March 2019, Defendants assert that the same policy governed Smith's accrual of good-time credits during the relevant time period. According to Defendants, this "earned sentence credit system" applied to offenders like Smith who were "sentenced for crimes committed after January 1, 1995—the date that Virginia abolished discretionary parole." Resp. Br. 9 & n.3.

[9] Under OP 830.3, any offender who commits a crime while in confinement is automatically reduced to Class Level IV upon conviction, and must remain at that level for at least one year. Smith was convicted of state charges relating to the assault at Keen Mountain in early 2014. *See Commonwealth v. Smith*, CR12000086-01 (Buchanan Cty. Cir. Ct.).

26

*accord* J.A. 227 (Dec. 2016). Importantly, each of these reasons is inextricably intertwined with the genuine factual disputes that exist with respect to Smith's experience in the Step-Down Program. First, Smith attests that it was *Defendants* who barred him from enrolling in programming. *See* J.A. 11–12. And the foregoing factual dispute about the existence of an adequate pathway and whether Smith was stalled at SM0 at Wallens Ridge bears directly on Smith's employment eligibility, *see* J.A. 91 (stating, in attachment to Step-Down Program OP 830.A, that SM0 prisoners are ineligible for employment), as well as the significance of his non-compliance with the grooming policy for good-time credit purposes, *see* J.A. 126 (stating, in Grooming Standards OP 864.1, that offenders may "not be restricted from earning good conduct time based solely on refusal to comply with grooming standards," except that offenders in segregation cannot rise to Level I).

Indeed, as Smith points out, the connection between the Step-Down Program and Class Level "is even more obvious given [his] simultaneous progression in both" once he moved back to Red Onion in December 2017. Reply Br. 16. The same day that Smith accelerated three levels in the Step-Down Program in October 2017, *see supra* p. 12 (discussing Smith's three-step jump from SM0 to SM-SL6), Red Onion officials recommended a change from Class Level IV to Class Level III, which allowed Smith to accrue good time credits for the first time in three years, *see* J.A. 235–36.

\*     \*     \*

There is at least a genuine issue of material fact as to whether Smith's conditions of confinement in administrative segregation at Wallens Ridge imposed an atypical and significant hardship, such that he had a protected liberty interest. Smith has presented

strong evidence that the conditions he endured in administrative segregation were severe in comparison to the conditions that exist in general population, and he has pointed to collateral consequences that may well be attributable to his segregation status, even if they are perhaps less severe than those contemplated in *Wilkinson*. Finally, although the duration of Smith's confinement in administrative segregation is shorter than the period of confinement that this Court found significant in *Incumaa*, it is not insubstantial, and there are also other indicia of indefiniteness in the record that are sufficient to create a factual dispute as to the existence of any pathway out of segregation at Wallens Ridge. Thus, on the present record, the three *Wilkinson* factors weigh in Smith's favor, and Defendants cannot prevail as a matter of law on the atypical-and-significant-hardship analysis. *See Incumaa*, 791 F.3d at 532 (holding that the absence of the third factor due to the plaintiff's pre-existing ineligibility for parole did not, in and of itself, "undermine the 'material and substantial similarities'" between that case and *Wilkinson* (quoting *Wilkerson*, 774 F.3d at 855)).

V.

That there is a genuine dispute as to the existence of a protected liberty interest does not end our inquiry, however. To succeed on his procedural due process claim, Smith must establish not only a liberty interest but also that Defendants failed to afford him adequate process to protect that interest. *See id.* Moreover, even if Smith successfully establishes a procedural due process violation, he cannot recover damages from Defendants if they are entitled to qualified immunity. *See Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th

28

Cir. 2013) ("Qualified immunity is an affirmative defense that shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (internal quotation marks omitted)); *see also* J.A. 63–65 (invoking qualified immunity in motion for summary judgment).

Because the district court determined that Smith had no liberty interest in avoiding administrative segregation at Wallens Ridge, the district court did not address whether Defendants' review of Smith's ongoing confinement in administrative segregation at Wallens Ridge satisfied procedural due process standards, or whether Defendants are entitled to qualified immunity based on the absence of then-existing clearly established law. Although Defendants urge us to reach these issues in the first instance on appeal and affirm the district court's judgment on alternative grounds, we decline to do so on the present record.

For starters, there is a clear need for further discovery on the adequacy-of-process issue. Smith submitted numerous discovery requests relating to the process that he received at Wallens Ridge, only some of which was answered. For example, Smith sought information about (1) the meaning of the "needs longer period of stable adjustment" rationale, *see* J.A. 269–71, which was cited in nearly every one of Smith's ninety-day ICA hearing reviews, *see* J.A. 214–17, 219–21, 223–25, 228–30; (2) the application of VDOC's review procedures in the context of the Step-Down Program and whether Smith was ever considered for the VHU, *see* J.A. 264–67, 275–77; and (3) the additional (non-ICA) layers

29

of review that existed under VDOC policy, *see* J.A. 39, 183–84, 272, 277. This information is plainly relevant to the risk of erroneous deprivation, *see generally Matthews v. Eldridge*, 424 U.S. 319, 335 (1976), and thus to the question of whether Smith received constitutionally adequate process, *see Wilkinson*, 545 U.S. at 224–27; *Incumaa*, 791 F.3d at 532–35. Therefore, the district court should address these issues in the first instance on remand, after Smith has been given the opportunity to conduct further discovery.[10]

We also leave the issue of qualified immunity to the district court on remand. This Court need not consider an alternative ground for affirmance that was not addressed by the district court, *see Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019), and we think it would be particularly unwise to do so here. Defendants dedicated a mere two pages to their qualified immunity argument below, and that argument has only taken on slightly more nuance on appeal. The district court will be better equipped to

---

[10] Recall that the magistrate judge determined that Smith's ability to respond to Defendants' motion for summary judgment did not hinge on any responses to his supplemental discovery requests and so denied without prejudice Smith's numerous motions to compel discovery. Although Smith, a pro se litigant, did not object to the magistrate's order, the two oppositions that Smith filed with the district court—the first before and the second after Defendants were ordered to respond to his first set of discovery requests—referenced the need for additional discovery under Federal Rule of Civil Procedure 56(d). The district court did not mention Smith's request, or the magistrate's denial of Smith's motions to compel, in its opinion and order granting summary judgment to Defendants. But in light of our holding that the district court erred in granting summary judgment to Defendants based on the absence of a protected liberty interest, as well as our decision to remand the case for further proceedings, we do not reach Smith's alternative argument that the district court abused its discretion in granting summary judgment to Defendants without allowing him an adequate opportunity for discovery. For now, we simply observe the potential relevance of that discovery for purposes of the adequacy-of-process issue that the district court did not reach.

assess the defense after supplemental briefing and further discovery. Indeed, qualified immunity in this case will likely turn on whether the multiple review mechanisms of Smith's prolonged solitary confinement were meaningful in practice. The answer to this question may affect the clearly-established inquiry with regard to not only the indefiniteness of Smith's confinement, and thus the existence of a protected liberty interest, *see supra* pp. 22–23, but also the risk of an erroneous deprivation, and thus the constitutional adequacy of any process provided, *see Incumaa*, 791 F.3d at 534. Yet we cannot answer it on this record.[11]

## VI.

For the foregoing reasons, we vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

---

[11] As we explain above, we express no opinion as to qualified immunity at this juncture. However, to the extent Defendants imply that the question of whether Smith had a clearly established protected liberty interest is straightforward on the present record, we note our skepticism. *Compare* Resp. Br. 50–51 (noting that every judge in the Western District of Virginia, where Wallens Ridge is located, has rejected claims that Level S conditions are harsh and atypical, including in cases spanning the time of Smith's confinement, and that two such decisions have been affirmed by this Court in unpublished decisions), *with Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 545 (4th Cir. 2017) ("Given that published district court opinions, like unpublished opinions from our Court, have no precedential value, it follows that we should not consider them."), *and Williamson v. Stirling*, 912 F.3d 154, 189 (4th Cir. 2018) ("*Incumaa* . . . gave clear notice to jail officials in 2015 that a long-term detention in solitary confinement—even when imposed for security reasons—justifies some level of procedural protection.").