**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1279

CARLTON & HARRIS CHIROPRACTIC, INC., a West Virginia Corporation, individually and as the representative of a class of similarly situated persons,

Plaintiff - Appellant,

v.

PDR NETWORK, LLC; PDR DISTRIBUTION, LLC; PDR EQUITY, LLC; JOHN DOES,

Defendants - Appellees.

Appeal from the United States District Court for the District of West Virginia, at Huntington.  Robert C. Chambers, District Judge.  (3:15-cv-14887)

Argued:  March 9, 2023                               Decided:  September 6, 2023

Before DIAZ, Chief Judge, and THACKER and HARRIS, Circuit Judges.

Vacated and remanded by published opinion.  Judge Harris wrote the majority opinion, in which Chief Judge Diaz and Judge Thacker joined.  Judge Thacker wrote a concurring opinion.

**ARGUED:**  Glenn Lorne Hara, ANDERSON & WANCA, Rolling Meadows, Illinois, for Appellant.  Kwaku A. Akowuah, SIDLEY AUSTIN LLP, Washington, D.C., for Appellee. **ON BRIEF:**  D. Christopher Hedges, CALDWELL LUCE DITRAPANO, Charleston, West Virginia, for Appellant.  Jeffrey N. Rosenthal, Philadelphia, Pennsylvania, Ana

Tagvoryan, BLANK ROME LLP, Los Angeles, California; Carter G. Phillips, Alice A. Wang, SIDLEY AUSTIN LLP, Washington, D.C., for Appellees.

_____

PAMELA HARRIS, Circuit Judge:

The plaintiff in this case, a chiropractic office, filed suit under the Telephone Consumer Protection Act after it received an unsolicited fax offering a free eBook with information about prescription drugs. The district court dismissed its complaint, holding that the plaintiff had not alleged that the fax, which tendered a product for free rather than for sale, was sufficiently commercial to bring it within the statutory prohibition on "unsolicited advertisements." We disagree. At this early stage of the litigation, we conclude, the plaintiff has adequately alleged that the fax offer had the necessary commercial character to make it an "unsolicited advertisement" under the Act. Accordingly, we vacate the district court's order and remand for further proceedings.

## I.

For context, we begin with the statutory provisions that govern this case. As amended by the Junk Fax Prevention Act of 2005, the Telephone Consumer Protection Act of 1991 ("TCPA" or "Act") generally prohibits the use of fax machines to send "unsolicited advertisement[s]." 47 U.S.C. § 227(b)(1)(C). "Unsolicited advertisement" is defined by the Act as "*any material advertising the commercial availability or quality of any property, goods, or services* which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *Id.* § 227(a)(5) (emphasis added). The central issue here is whether a fax that touts the "quality" of a "good[]" that is offered for free, rather than at a price, can fall within that definition.

3

The unsolicited fax in question was received by Carlton & Harris Chiropractic, Inc., in its West Virginia office in 2013. It was sent by the defendants in this action, referred to collectively as PDR Network.[1] As we explained in our first encounter with this case, PDR Network publishes the *Physicians' Desk Reference*, a compilation of medical prescribing information for certain prescription drugs. Pharmaceutical companies pay PDR Network to list their drugs in the *Physicians' Desk Reference. Carlton & Harris Chiropractic, Inc., v. PDR Network, LLC* (*PDR I*), 883 F.3d 459, 462 (4th Cir. 2018).

PDR Network addressed its fax to Carlton & Harris's "Practice Manager" and urged the recipient to "reserve" a "FREE 2014 *Physicians' Desk Reference* eBook." J.A. 31. The fax provided a link for that purpose, as well as a customer-service phone number and email address. Below a picture of the eBook were bullet points calling attention to features thought to appeal to the recipient: The eBook contained the "[s]ame trusted, FDA-approved full prescribing information" as the hard-copy *Physicians' Desk Reference*, but "[n]ow in a new, convenient digital format," and it had been "[d]eveloped to support your changing digital workflow." *Id.* At the bottom was a notice that the recipient could "opt-out of delivery of clinically relevant information about healthcare products and services from PDR via fax" by calling a listed phone number. *Id.*

---

[1] The defendants are PDR Network, LLC; PDR Distribution, LLC; PDR Equity, LLC; and John Does 1–10. For present purposes, they do not dispute that they are the senders of the fax.

4

Carlton & Harris filed a putative class action complaint against PDR Network alleging a violation of § 227 of the TCPA.[2]  The result was years of extensive and complex proceedings through multiple courts.  Those proceedings focused mostly on administrative law questions regarding what we called the "2006 FCC Rule," which implements the TCPA and treats faxes that "promote goods or services even at no cost" as prohibited "unsolicited advertisements."  Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991; Junk Fax Prevention Act of 2005, 71 Fed. Reg. 25967, 25973 (May 3, 2006); *see PDR I*, 883 F.3d at 463.  For those who are interested, the details may be found in our two previous opinions in this case and the Supreme Court decision that issued between them.  *See PDR I*, 883 F.3d 459; *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051 (2019); *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC* (*PDR II*), 982 F.3d 258 (4th Cir. 2020).

By the time we issued our second opinion, much of that brush had been cleared away.  Most important, there was no longer a question of *Chevron* deference:  Because the 2006 FCC Rule is interpretive and not legislative, we explained, *Chevron* deference is inappropriate.  *PDR II*, 982 F.3d at 264.  Instead, whether PDR Network's fax qualified as an "unsolicited advertisement" under § 227 turned, first, on the statutory language itself, and then, if the statute was ambiguous, on whether the 2006 FCC Rule was sufficiently

---

[2] The TCPA includes a private cause of action allowing the recipient of an unsolicited fax advertisement to recover actual monetary losses or statutory damages of $500 for each violation.  47 U.S.C. § 227(b)(3).  Statutory damages may be tripled if a court finds that a violation is "willful[] or knowing[]."  *Id.*

5

persuasive to merit so-called *Skidmore* deference. *See id.* (citing *Gonzales v. Oregon*, 546 U.S. 243, 256 (2006)). We remanded to the district court to consider that question in the first instance. *Id.* at 260.

On remand, Carlton & Harris amended its complaint and PDR Network again moved to dismiss. The district court granted the motion, holding that PDR Network's fax did not constitute an "advertisement" under the TCPA because it offered the eBook for free and not for sale. *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC* (*PDR III*), Civ. No. 3:15-14887, 2022 WL 386097, at *7 (S.D. W.Va. Feb. 8, 2022).

The court's analysis proceeded in two basic steps. First, for the district court, it was clear from the TCPA's definition of "unsolicited advertisement" – as relevant, "any material advertising the commercial availability or quality of any property, goods, or services" – that a fax could qualify only if it had a "commercial component" or "discernible commercial purpose." *PDR III*, 2022 WL 386097, at *3–5. And second, the district court concluded, PDR Network's fax lacked that "requisite commercial aspect" because it promoted a product – the eBook – that was "not for sale." *Id.* at *5. The court did not doubt that the fax could be said to "speak[] to the quality of the free eBook," describing its "convenient digital format" and "trusted, FDA-approved" prescribing information. *Id.*; *see* 47 U.S.C. § 227(a)(5). But because the fax "sells nothing," the court reasoned, it could not qualify as an "advertisement," *PDR III*, 2022 WL 386097, at *5 – and because a "plain reading of the TCPA's text" left no ambiguity on that point, there was no occasion to consider the 2006 FCC Rule, *id.* at *3.

6

The court recognized that the plaintiff's amended complaint included new allegations directed at the "required commercial connection under the TCPA" but found them inadequate. *Id.* at *7. Carlton & Harris now alleged, for instance, that PDR Network effectively earned a commission for each successful promotion of an eBook by way of fax, because the amount paid by drug companies to have their products included in the *Physicians' Desk Reference* turned on the number of eBook versions distributed. But that kind of "ancillary" financial benefit, the court held, was "too remote" to demonstrate the necessary commercial nexus. *Id.* The plaintiff also alleged that the fax was a "pretext" or prelude for future sales efforts, in that it notified recipients they would continue to receive faxes "about healthcare products and services from PDR." J.A. 17. The district court rejected that theory, too, noting that the only reference to those products and services came in the context of an opt-out notice. *PDR III*, 2022 WL 386097, at *7. The court ended where it began: No "underlying and distant commercial purpose" would change the fact that the fax "does not offer something for sale." *Id.*

## II.

We review de novo the district court's grant of PDR Network's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *PDR I*, 883 F.3d at 462. Importantly, at this stage of the litigation, we "assum[e] as true the complaint's factual allegations" and we construe "all reasonable inferences" in favor of the plaintiff, Carlton & Harris. *Id.* (internal quotation marks omitted).

7

On appeal, PDR Network defends both steps in the district court's reasoning, arguing that a fax must be "commercial" to qualify as an "advertisement" under the TCPA and that Carlton & Harris has not alleged the requisite commercial character. Carlton & Harris, for its part, disputes both portions of the court's reasoning, contending that a prohibited "advertisement" may be entirely non-commercial and that, in any event, it has adequately alleged that the fax it received was commercial in nature.

As explained below, we agree with the district court and PDR Network in a critical respect: The TCPA's general prohibition on unsolicited "advertisements" is best read to cover only faxes of a commercial nature. But we also agree with Carlton & Harris that the allegations in its amended complaint suffice to meet that standard at this early stage of the litigation. We therefore vacate the district court's order and remand for further proceedings.

**A.**

1.

We begin with the statutory text. Again, the TCPA generally prohibits sending via fax an "unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C). And, per the statute, the "advertisement" part of "unsolicited advertisement" means "any material advertising the commercial availability or quality of any property, goods, or services." *Id.* § 227(a)(5). We conclude that "advertisement," as used and defined in the TCPA, is limited to faxes that are "commercial in nature." *Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, 788 F.3d 218, 224 (6th Cir. 2015).

8

Our conclusion flows mostly from the "everyday" understanding of the term "advertise." *Id.* at 222. "Advertise" customarily has a distinctly commercial flavor, invoking a *business* solicitation, designed to "attract[] clients or customers" and in the "hopes to make a profit, directly or indirectly." *Id.* When "[e]veryday people" hear the word "advertisement," they think of "everyday ads," like those they see on television, *id.* – sometimes referred to, tellingly, as "commercials." What is being transmitted is not just information, but information with a "commercial nexus" to the sender's "business." *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharms., Inc.*, 847 F.3d 92, 96 (2d Cir. 2017). The commercial "concept," in other words, is "part of the common understanding of what constitutes an ad." *Sandusky*, 788 F.3d at 224.

We recognize, as Carlton & Harris argues, that "advertise" *can* be used differently, in a way that does not "implicate a profit seeking motive" and instead means only to call attention to something. *PDR I*, 883 F.3d at 472 (Thacker, J., dissenting). But the "context in which ["advertise"] is used, and the broader context of the [TCPA] as a whole," *Yates v. United States*, 574 U.S. 528, 537 (2015), point to the commercial definition as the one intended here. First, as the Sixth Circuit emphasized, the "word 'commercial' is in the Act's definition" itself. *Sandusky*, 788 F.3d at 224; *see* 47 U.S.C. § 227(a)(5) ("material advertising the *commercial* availability or quality of any property, goods, or services" (emphasis added)). "So 'commercial' must play a role – *some* role" in defining advertisement, foreclosing a reading that would jettison the concept entirely. *Sandusky*, 788 F.3d at 224; *see Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, Civ. No.

9

3:15-14887, 2016 WL 5799301, at *4 (S.D.W. Va. Sept. 30, 2016).[3] Second, as the district court has recognized from the start, Congress enacted the TCPA "to combat an explosive growth in unsolicited facsimile advertising, or 'junk fax'" – that is, "faxes with a commercial nature." *PDR I*, 883 F.3d at 468 (internal quotation marks omitted) (quoting, in part, *PDR Network*, 2016 WL 5799301, at *4). Indeed, this form of "telemarketing" was targeted in part because use of the recipient's fax machine shifted "costs of advertising" from the sender to the recipient, H.R. Rep. No. 102-317, at 10 (1991) – again invoking the kind of commercial advertising in which a business absorbs costs in the hopes of ultimate profit.

In reading prohibited "unsolicited advertisements" as reaching only faxes of a commercial nature, we align ourselves with a broad consensus in the case law. To be sure, there are differences in the precise formulations adopted by courts in defining "unsolicited advertisement" under § 227. But on the threshold question of whether a fax "advertisement" must have commercial character, there is wide agreement: A prohibited "advertisement" is a "commercial solicitation" – "of, in, or relating to commerce," with

---

[3] The parties vigorously debate what exactly is modified by the word "commercial" in § 227(a)(5)'s definition – which, again, reaches "material advertising the commercial availability or quality of any property, goods, or services." According to Carlton & Harris, "commercial" modifies only "availability," so that any fax "advertising" the "quality" of a product would be covered. PDR Network, on the other hand, reads "commercial" as modifying both "availability" and "quality," so that the definition would be limited to faxes "advertising" the "commercial availability" or "commercial quality" of a product. Like Carlton & Harris, we have questions about what work the phrase "commercial quality" would do on PDR Network's reading. But we need not resolve this grammatical puzzle here: Regardless of how the modifier "commercial" is applied, we read the word "advertising" *itself* to embody a commercial component.

10

"profit as the primary aim." *Sandusky*, 788 F.3d at 225, 222–23 (internal quotation marks omitted).  There must be a "commercial component," *BPP v. CaremarkPCS Health, LLC*, 53 F.4th 1109, 1112 (8th Cir. 2022), or a "commercial nexus" to the sender's business – "its property, products, or services," *Boehringer*, 847 F.3d at 96.  Put simply, "[t]he TCPA does not bar the unsolicited sending of faxes that lack commercial components."  *BPP*, 53 F.4th at 1112; *see also Florence Endocrine Clinic v. Arriva Med., LLC*, 858 F.3d 1362, 1366 (11th Cir. 2017).

2.

In arguing for a broader reading of "unsolicited advertisement" – one that would extend to any fax that promotes the "quality" of a free good or service, even in the absence of a commercial nexus or profit motive – Carlton & Harris relies primarily on the 2006 FCC Rule. That Rule, as noted above, treats as "unsolicited advertisements" fax messages "that promote goods or services even at no cost," 71 Fed. Reg. at 25973, reasoning that these "purportedly 'free'" offers "often have commercial strings attached." *See PDR I*, 883 F.3d at 467.  According to Carlton & Harris, that is a persuasive interpretation of the statutory language to which we should defer under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  For two reasons, we disagree.

First, the 2006 FCC Rule does not actually support the proposition advanced by Carlton & Harris:  that the term "unsolicited advertisement" in § 227 is properly read to include purely non-commercial offers of free goods and services, like a fax sent by a charity alerting potential beneficiaries of their eligibility for free assistance.  And we know that because the 2006 FCC Rule says as much.  In declining to carve out an exemption for

11

nonprofit organizations from the general ban on "unsolicited [fax] advertisements," the Rule clarifies that an exemption would be largely unnecessary, given that "messages that are *not commercial in nature* – which many nonprofits send – do not constitute 'unsolicited advertisements'" in the first place. 2006 FCC Rule, 71 Fed. Reg. at 25972 (emphasis added). It seems clear, in other words, that contrary to Carlton & Harris's understanding, the 2006 FCC Rule does not contemplate liability for a fax sent with "no objective other than to give away free goods or services." *Boehringer*, 847 F.3d at 102 (Leval, J., concurring) (referencing 2006 FCC Rule's "discussion of how the statute treats nonprofits").

There is, of course, also the portion of the Rule on which Carlton & Harris relies, which does indeed purport to prohibit all unsolicited "offers for free goods and services." 2006 FCC Rule, 71 Fed. Reg. at 25973; *PDR I*, 883 F.3d at 467–68 (discussing 2006 FCC Rule). But we do not understand that rule as resting on agency interpretation of the statutory term "advertisement" that brings within its scope "messages that are not commercial in nature" – in part because the agency expressly takes the opposite view elsewhere in the same Rule, as noted above. *See* 71 Fed. Reg. at 25972. Instead, as we explained in *PDR I*, the 2006 FCC Rule sets out a "prophylactic presumption" that all "offers for free goods and services" will qualify as "advertisements" under § 227, obviating the need for a case-by-case inquiry into their commercial nature. 883 F.3d at 467–68. Because so-called "free" offers so frequently mask commercial purposes, that is, the agency concluded that the benefits of clarity and ease of enforcement justified a somewhat "overinclusive" prophylactic rule. *Id.* That may be a perfectly reasonable approach to

12

implementing the TCPA – as we suggested in *PDR I* – but it is not an agency construction of the term "advertisement" to which we would defer under *Skidmore* in answering the statutory interpretation question before us.

And in any event, we agree with the district court that the statute is clear enough on this point that there would be no room for deference to an alternative agency construction. *See PDR III*, 2022 WL 386097, at *3. Again, we appreciate that the word "advertise," standing alone, may have a non-commercial meaning. But as the Supreme Court recently clarified, we cannot label a statute "ambiguous" and defer to an agency interpretation without first exhausting "all the traditional tools of construction," considering the "text, structure, history, and purpose" of a statutory provision. *See Cela v. Garland*, __ F.4th __, __, No. 22-1322, 2023 WL 4831594, at *3 (4th Cir. July 28, 2023) (internal quotation marks omitted) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)). And when we deploy those tools here and consider the full statutory context, we can discern that the term "unsolicited advertisement," as used in the TCPA, does not include offers or solicitations with no commercial component or purpose. *See BPP*, 53 F.4th at 1112–13 (giving no deference to 2006 FCC Rule in part because statutory language is unambiguous as to requirement of "commercial component[]").[4]

---

[4] PDR Network also argues that we should construe the term "unsolicited advertisement" as limited to commercial faxes to avoid First Amendment issues that otherwise would arise. In enacting the TCPA, PDR Network contends, Congress was mindful of the greater First Amendment protections that apply outside the context of commercial speech, and thus cabined its ban on "junk faxes" to messages of a commercial nature. As detailed above, we reach the same result through ordinary tools of statutory

13

**B.**

Our conclusion that a TCPA-prohibited "unsolicited advertisement" must be of a commercial nature would have been the end of the matter when this case was first filed: In filing its initial complaint, Carlton & Harris relied entirely on the 2006 FCC Rule for a non-commercial reading of "advertisement," and for several rounds of litigation, the plaintiff's case rose or fell on whether a "commercial aim" is required. *See PDR I*, 883 F.3d at 463. But now Carlton & Harris has amended its complaint, and so we turn to its alternative argument that it has adequately alleged the necessary commercial component.

1.

As we read the amended complaint and briefs, the plaintiff relies on two allegations to show that PDR Network's fax is commercial in nature. First is what we will call the "commission allegation": The fax promotes a product – the eBook – on which PDR Network earns a commission. According to the amended complaint, PDR Network "receive[s] money from the pharmaceutical companies whose drugs are listed in the *Physicians' Desk Reference*," and "the amount of money" it receives "turns on how many copies" of the eBook it can distribute to medical practitioners like Carlton & Harris. J.A. 18. In other words, PDR Network profits when its fax persuades a medical practitioner to accept the proffered eBook. We appear to be the first court of appeals to consider a

construction, so have no occasion to consider application of the constitutional-avoidance canon. *See United States v. Simms*, 914 F.3d 229, 251 (4th Cir. 2019).

commission allegation like this, and at this early stage of the litigation, we conclude that it is sufficient to establish the requisite commercial element.

Taken as true, as it must be, the plaintiff's commission allegation describes what we might colloquially call a product "pitch." The fax undoubtedly promotes the "quality" of the eBook, *see* 47 U.S.C. § 227(a)(5) (defining "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services"), as the district court recognized, *PDR III*, 2022 WL 386097, at *5, extolling the eBook's virtues and its benefits for the recipient's practice. It does so to persuade the recipient to accept the offer of a free eBook. And critically, as with a classic sales pitch, the promoter profits if the pitch lands and the offer is accepted. This is not the rare case in which free products are distributed via fax "without hope of financial gain." *PDR I*, 883 F.3d at 468. PDR Network's *business* is distribution of the *Physicians' Desk Reference* and an associated "suite of services," and its business runs, in part, on the money it earns when a fax solicitation succeeds in placing a digital version of the *Physicians' Desk Reference* with a medical practitioner. J.A. 17. There is, in other words, a straightforward "commercial nexus" between the fax in question and PDR Network's "business." *See Boehringer*, 847 F.3d at 96.

The district court saw it differently, holding that the fax did not qualify as a commercial advertisement because it offered the eBook for free, rather than for sale to the fax recipient. *PDR III*, 2022 WL 386097, at *5 (finding that "there is no requisite commercial aspect" to the fax because it "sells nothing"). PDR Network takes much the same position on appeal. And we recognize that some (though not all) of the formulations

15

offered by courts in holding that TCPA "advertisements" must be "commercial" in nature emphasize the promotion of "goods or services to be bought or sold." *See Sandusky*, 788 F.3d at 222; *PDR III*, 2022 WL 386097, at \*4 (citing cases).

As we have explained already, however, "requiring a fax to propose a specific commercial transaction on its face takes too narrow a view of the concepts of commercial activity and promotion." *PDR I*, 883 F.3d at 468.  We agree, as discussed above, that a fax must be "commercial" to fall within the TCPA's definition of "unsolicited advertisement." But nothing in the text of the TCPA or in general usage limits the "concept . . . [of] commercial," *Sandusky*, 788 F.3d at 224 (emphasis omitted), to direct sales.  *See*, *e.g.*, *id.* at 222 (defining "commercial" as "of, in, or relating to commerce," "from the point of view of profit," and "something that *relates* to buying and selling" (emphasis added) (internal quotation marks omitted)).  The plaintiff alleges that PDR Network is paid when it places a free eBook via fax.  That the payment comes from a drug company rather than the fax recipient – that PDR Network is effectively selling space in its *Physicians' Desk Reference* rather than eBooks – does not, we think, strip the transaction of its "commercial" character. *See PDR I*, 883 F.3d at 468 (requiring that fax on its face propose specific commercial transaction "ignores the reality of many modern business models").

To be clear, it is not PDR Network's alleged profit motive alone that gives its faxes the requisite commercial character under the TCPA.  A purely informational fax – one that does not tout the "quality of any property, goods, or services," 47 U.S.C. § 227(a)(5) – would not qualify as an "unsolicited advertisement" even if the sender hoped to profit "through branding, goodwill, or other indirect effects." *BPP*, 53 F.4th at 1113.  The FCC

16

has endorsed that reading, clarifying that faxes "that contain only information, such as industry news articles, legislative updates, or employee benefit information" are not prohibited by the TCPA, 2006 FCC Rule, 71 Fed. Reg. at 25973, and courts have relied on it in rejecting allegations that informational faxes might produce "financial[] benefit" for their senders "several locks down the stream of commerce," *see Sandusky*, 788 F.3d at 225. But here, at least as alleged, we have not just profit, but also a pitch: PDR Network's fax touts the virtues and "quality" of the eBook, and if that pitch is successful, PDR Network profits by way of commission. It is that combination, we conclude, that makes the fax in question sufficiently commercial to qualify as an "advertisement" under the TCPA. We suggested as much in *PDR I*, *see* 883 F.3d at 468, and our view has not changed.

So understood, our holding does not conflict with the cases cited by PDR Network, in which courts have dismissed complaints that allege only a more attenuated or, in the words of the district court, "ancillary" relationship between a fax and potential profit to the sender. *See PDR III*, 2022 WL 386097, at *7. In *Sandusky*, for instance, the court considered faxes sent by a pharmacy benefit manager to a chiropractic company, listing medications available in the health plans of the practice's patients. 788 F.3d at 220. Those faxes were not "commercial in nature," the court concluded, because they were purely informational and did not offer the recipient a product or service. *Id.* at 223 (citing 2006 FCC Rule); *see PDR I*, 883 F.3d at 469 n.5 (distinguishing *Sandusky* and other cases that "involve informational faxes rather than offers of free goods or services"). And the prospect that the sender might nevertheless profit through some "extraneous and speculative" effect on its business was not enough to convert the informational faxes into

17

"advertisements." *Sandusky*, 788 F.3d at 225; *see also BPP*, 53 F.4th at 1113 (rejecting similar argument). Likewise, a fax asking healthcare recipients to verify demographic data – but not describing a product or asking recipients to buy anything – is not a prohibited TCPA "advertisement," even if the sender uses the data it solicits to populate databases that it then sells to clients. *Robert W. Mauthe, M.D., P.C. v. Optum Inc.*, 925 F.3d 129, 132–33 (3d Cir. 2019).

We recognize, again, that in distinguishing faxes like these from commercial "advertisements," courts sometimes emphasize that they do not propose a sale to the recipient. *See, e.g.*, *Sandusky*, 788 F.3d at 222. But what those cases turn on is the absence of *any* offer of a product or service, free or otherwise, together with the principle that this gap cannot be filled by the possibility that the sender "might gain an ancillary, remote, and hypothetical economic benefit later on." *Id.* at 225. Here, by contrast, there is an offer – indeed, an upfront promotion – of a product, and it is coupled with a direct mechanism by which the sender will profit if the offer is accepted, in the form of the plaintiff's commission allegation. That makes this case different, taking it outside the ambit of decisions like *Sandusky*.

Instead, this case more resembles *Boehringer*, in which the court considered a fax sent to a medical practice by a pharmaceutical company, offering a free and "informative" dinner meeting discussing certain physical ailments related to the company's products. 847 F.3d at 93–94. That fax, like the one at issue here, offered no product for sale to its recipient. But that did not by itself, the court explained, mean that the fax lacked the necessary "commercial nexus." *Id.* at 95–96; *see Sandusky*, 788 F.3d at 225 (agreeing that

18

"a fax need not be an explicit sale offer" to qualify as an "advertisement"). The plaintiff had alleged that the defendant would profit from its free offer indirectly, by promoting its products at the free dinner, which would in turn be enough to make the fax a commercial "advertisement." *Boehringer*, 847 F.3d at 95. Here, too, we have the same critical pairing of promotion with profit. To be sure, this transaction involves three parties, not two; PDR Network profits by way of commission payments by drug companies, not fax recipients. But we see no reason why the "commercial" nature of PDR Network's pitch for its eBooks should turn on the number of parties involved in its business model.

Finally, we emphasize that this litigation remains in its early stages. It is still the case today, as we first observed in *PDR I*, that Carlton & Harris has yet to take any discovery, which means that little is known about the "details of PDR Network's business model" or even the contents of its eBook. *See* 883 F.3d at 468; *see also Boehringer*, 847 F.3d at 95–96 (noting difficulties faced by plaintiffs, pre-discovery, in knowing whether free fax offer has requisite "commercial purpose"). Carlton & Harris's commission allegation may be plausible, *see PDR I*, 883 F.3d at 468, but that does not mean it will be borne out by discovery. Instead, discovery may show that there are no commission payments, nor anything else to support a finding that PDR Network's free offer is commercial in nature. Indeed, that is what happened in both *Sandusky* and *BPP*, which affirmed district court grants of summary judgment to TCPA defendants after discovery had been completed. *Sandusky*, 788 F.3d at 225 ("[N]o record evidence reliably shows that there would be . . . a financial benefit from these faxes[.]"); *BPP*, 53 F.4th at 1113 (finding no record evidence to support "supposed business rationale" under which

19

apparently informational fax would in fact have been designed to solicit business).  But for present purposes, we accept as true Carlton & Harris's commission allegation and find it adequate, at this preliminary stage, to state a claim that the fax offer of a free eBook is a commercial "advertisement" subject to the TCPA.

2.

We reach a different result with respect to the plaintiff's second new allegation:  that PDR Network's fax is a "pretext" to future advertising.  As framed in Carlton & Harris's amended complaint, this allegation turns entirely on the opt-out notice at the bottom of the fax:  "To opt-out of delivery of clinically relevant information about healthcare products and services from PDR via fax, call [listed phone number]."  J.A. 31.  According to the plaintiff, because the fax refers to the prospect of future transmissions "about healthcare products and services from PDR," and *those* products and services are commercially available for sale, the offer of a free eBook is a "pretext" for future commercial advertising. J.A. 17.

This "pretext" allegation invokes a term of art used by the FCC and TCPA case law. In its most basic form, a prohibited "pretext" would be a fax advertisement that calls itself something else – say, a survey – but in fact promotes a product or service for sale.  *See* 2006 FCC Rule, 71 Fed. Reg. at 25973.  What Carlton & Harris is alleging – a "'pretext' to *future* advertising," J.A. 17 (emphasis added) – is somewhat more sophisticated:  A fax that offers a good or service that is free but will be used, once accepted, to promote goods or services at a cost.  The prototypical case law example is the fax at issue in *Boehringer*, which allegedly invited doctors to a free dinner seminar at which they would be solicited

20

for sales by the drug company that sent the fax.  That offer of a free seminar, the court concluded, was a "pretext" or prelude for a sales promotion, giving it the "commercial nexus" necessary to qualify as a TCPA "advertisement."  847 F.3d at 96; *see also id.* at 98 (Leval, J., concurring); 2006 FCC Rule, 71 Fed. Reg. at 25973 (discussing similar genre of "'free' seminars [that] serve as a pretext to advertise commercial products and services").  Offers of free goods, too, can serve as a pretext for a subsequent solicitation.  *See* 2006 FCC Rule, 71 Fed. Reg. at 25973 (describing fax that offers free publication that in turn includes product promotions).  Either way, the basic idea is the same:  Acceptance of a free good or service is leveraged into an opportunity for a sales pitch, giving the free fax offer a "commercial pretext."  *Boehringer*, 847 F.3d at 95.

We have no reason to doubt the legal viability of this pretext theory.  It has been endorsed by other courts, *see*, *e.g.*, *Boehringer*, 857 F.3d at 97; *Sandusky*, 788 F.3d at 225; *but see Mauthe*, 925 F.3d at 135 (leaving question open), and regularly applied by the FCC, *see*, *e.g.*, Presidential Who's Who DBA Presidential Who's Who, Inc., 25 FCC Rcd. 13759 (2010) (concluding that fax offering recipients free listing in directory was an "unsolicited advertisement" because free listing was then leveraged for subsequent sales pitch for directory).  But in any event, we agree with the district court that even under that theory, the pretext allegation in this case, centered on the fax's opt-out notice, falls short of "creat[ing] the required underlying commercial nexus."  *PDR III*, 2022 WL 386097, at *7.

The problem for the plaintiff is that the factual allegation in its amended complaint does not match the legal theory it is relying on.  Carlton & Harris does not allege that accepting the eBook would open the door to future advertising – that the eBook itself, for

21

instance, contains promotions for PDR Network products, *cf.* 2006 FCC Rule, 71 Fed. Reg. at 25973, or that it would otherwise serve as a prelude to subsequent solicitations. Instead, Carlton & Harris alleges something like the opposite: that regardless of whether it accepts the free eBook offer and even if it does nothing at all, it will receive future promotional faxes, per the quoted opt-out notice. J.A. 17. But the point of the pretext theory, again, is that the free *offer* takes on a commercial character because its acceptance will lead to a subsequent sales pitch, *see Boehringer*, 847 F.3d at 95–96, and here, on the plaintiff's own account, the free eBook offer has nothing to do with the future sales promotions referred to in the opt-out clause. However annoying the hypothesized future faxes may be, that is, they cannot convert a prior and unrelated free offer into something "commercial" under the pretext theory.

## III.

For the reasons given above, the district court's order is vacated and the case remanded for proceedings consistent with this opinion.

*VACATED AND REMANDED*

22

THACKER, Circuit Judge, concurring:

I concur in the thorough majority opinion given that the "burden at the pleading stage" is "minimal." *Carlton & Harris Chiropractic, Inc., v. PDR Network, LLC* ("*PDR I*"), 883 F.3d at 474 (Thacker, J., dissenting). Moreover, as I recognized in my 2018 dissenting opinion, "[b]ecause the TCPA is a remedial statute, it 'should be liberally construed and . . . interpreted . . . in a manner tending to discourage attempted evasions by wrongdoers.'" *PDR I*, 883 F.3d at 474 (Thacker, J., dissenting) (quoting *Scarborough v. Atl. Coast Line R. Co.*, 178 F.2d 253, 258 (4th Cir. 1949); *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013) ("The TCPA is a remedial statute that was passed to protect consumers . . .")). However, I write separately to express my view that this lawsuit pushes the outer limits of that "minimal" burden and liberal construction.

I agree that because of the low pleading bar, this case remains alive, but in my view, the prognosis is not good.