**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-6437**

---

WILLIAM KIMBLE, JR.,

Plaintiff - Appellant,

v.

GREGORY SWINK; HUBERT CORPENING; DAVID COTHRON,

Defendants - Appellees.

---

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, Chief District Judge.  (1:21-cv-00057-MR-WCM)

---

Argued:  October 25, 2023                    Decided:  February 20, 2024

---

Before DIAZ, Chief Judge, THACKER, Circuit Judge, and Julie R. RUBIN, United States District Judge for the District of Maryland, sitting by designation.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:**  Clare W. Magee, Schuyler C. Pruis, WAKE FOREST UNIVERSITY SCHOOL OF LAW, Winston-Salem, North Carolina, for Appellant.  Alex Ryan Williams, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.  **ON BRIEF:**  John J. Korzen, Maryclaire M. Farrington, Law Student Counsel, Sophia Sulzer, Law Student Counsel, Jacob Winton, Law Student Counsel, WAKE FOREST UNIVERSITY SCHOOL OF LAW, Winston-Salem, North Carolina, for Appellant.  Joshua H. Stein, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina,

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

William J. Kimble, Jr. ("Appellant"), was an inmate in the custody of the North Carolina Department of Public Safety ("NCDPS") in February 2018 when he was transferred to a unit known as the Rehabilitative Diversion Unit ("RDU"). Appellant alleges his placement in the RDU subjected him to solitary confinement conditions for nearly 400 days, and that he was placed and held there without due process of law, in violation of the Fourteenth Amendment to the Constitution. Appellant filed this lawsuit seeking redress for violation of his Fourteenth Amendment rights.

The district court dismissed Appellant's complaint for failure to state a claim upon which relief can be granted. Because we conclude that Appellant has not sufficiently alleged that the conditions in the RDU amounted to atypical and significant hardship, we affirm.

I. [1]

Appellant began his term of imprisonment in the custody of the NCDPS in April 2016. Initially, Appellant was housed in the general population at the Pasquotank Correctional Institution. But after he committed a disciplinary infraction, Appellant was transferred to a more restrictive unit known as the Restrictive Housing for Control Purposes ("RHCP") unit. Before his transfer to the RHCP unit, Appellant alleges he was given notice and an opportunity to be heard by a disciplinary hearing officer, a facility

---

[1] Because we accept Appellant's allegations as true at this stage, we discuss the facts below as alleged in Appellant's complaint and the documents expressly referenced therein.

3

classification committee, and a director's classification committee.  Appellant was placed in the RHCP on or around January 24, 2018, and his placement there was scheduled to be reviewed on May 21, 2018.

However, just over one month after his placement in the RHCP unit, Appellant was transferred to the Marion Correctional Institution ("MCI") in Marion, North Carolina, and placed in the RDU, where he remained "housed in solitary confinement-like conditions for approximately 400 consecutive days." J.A. 5.[2]  Appellant alleges that NCDPS officials[3] ("Appellees") identified him as eligible for placement in the RDU after he was placed in the RHCP.  While Appellant alleges that NCDPS officials, including Appellee Swink, reviewed his file to determine whether he was appropriate for placement in the RDU, Appellant claims that he did not receive notice that he was being considered for transfer into the RDU, nor did he receive "a hearing, an opportunity to question witnesses or present evidence, or another opportunity to be heard regarding whether he should be enrolled in the RDU." *Id.* at 21.  Appellant further alleges, "neither [Appellee] Swink nor other NCDPS staff gave [him] a written or verbal explanation of the reasons behind his enrollment in the RDU." *Id.*  And Appellant alleges that the RDU is "unlike RHCP and

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[3] Appellant named Gregory Swink, program director of the RDU; Hubert Corpening, Superintendent of MCI; and David Cothron, Assistant Superintendent of Programs at MCI, as defendants in his complaint.  There is no evidence in the record that Appellant ever served Corpening, but the district court dismissed the complaint against him on the same legal basis as the other defendants.  For clarity, this opinion refers to all defendants collectively as "Appellees."

other forms of restrictive housing [because] prisoners in the RDU do not receive any kind of meaningful, recurring review of the continued confinement in the RDU." *Id.* at 11.

A.

The RDU

Appellant alleges that the RDU is "a non-voluntary program described by NCDPS as an alternative to long-term restrictive housing." J.A. 8. "To be enrolled in the RDU, a prisoner must be a close custody male prisoner, be at least twenty-one years old, have an active control status of [RHCP]," and meet other mental health and cognitive guidelines. *Id.* Appellant alleges that the RDU is "[u]nlike RHCP and other forms of restrictive housing" in that it "has an indefinite duration." *Id.* at 11.

The RDU has three phases, with the first two phases each containing two subphases. Inmates placed in the RDU begin in Phase IA, and must progress through Phases IB, IIA, IIB, and III before graduating from the RDU and being transferred to less restrictive housing. According to Appellant, NCDPS policy does not provide any upper limit on the amount of time an inmate may spend in any particular phase, but it does provide the following minimums:

> Phase IA: 60 days
> Phase IB: 70 days
> Phase IIA: 70 days
> Phase IIB: 70 days
> Phase III: 84 days

*See* J.A. 14–15. In other words, once an inmate is placed in the RDU, he remains there for a minimum of 354 days. Appellant alleges "[u]pon information and belief, in the past, prisoners have spent up to four years in the RDU." *Id.* at 11.

5

During each phase of the RDU, prisoners complete specified journaling exercises and classes "related to problematic behavioral issues, such as anger management and alcohol or drug addiction." J.A. 12. All prisoners participate in the same classes and journaling exercises during Phases I and II, even if the topics are "unrelated to behavioral issues they have actually exhibited." *Id.* If a prisoner exhibits "aggressive or assaultive behavior" or refuses to participate in the classes and journaling exercises, the prisoner may be placed on "non-participating status." *Id.* at 13. When a prisoner is on non-participating status, "he stops progressing through the RDU, loses privileges that he may have had, . . . and may be placed in restrictive housing or remain in his current housing unit." *Id.* at 13–14. There is no limit on the amount of time a prisoner may spend on non-participating status, nor is there a limit on the number of times an inmate may be placed on that status. When NCDPS officials, including Appellee Swink, determine that a prisoner can be removed from non-participating status, the prisoner "may resume RDU participation in a subphase they already completed." *Id.* at 14.

B.

Appellant's Conditions of Confinement

Appellant alleges he was housed in the RDU for a total of 398 days -- 138 days in Phase I, 184 days in Phase II, and 76 days in Phase III. Appellant alleges that the conditions in the RDU "mirror and, in some ways, are more limiting and inhumane than those in restrictive housing, especially during phases IA and IB." J.A. 15.

During the 138 days Appellant spent in Phase I, Appellant received only one hour of recreation time, five times per week. He was required to eat all of his meals alone in his

6

cell and was given only twenty minutes for each meal.  He could possess only two personal books or magazines, twenty sheets of paper, and limited hygiene products.  During the first 60 days of Phase I, Appellant could not make or receive any phone calls and, for the remainder of Phase I, he was permitted one fifteen minute call every thirty days.  He was allowed one non-contact visit each month during his time in Phase I.  In addition, he was "in full restraints and tethered by short cables to tables in the dayroom for the duration of the required weekly group classes."  J.A. 17.

Appellant does not specifically allege much about the conditions during his 184 days in Phase II.  But he does allege that he was allowed one additional non-contact visit, for a total of two every month.  Appellant also alleges that during all of Phase I and most of Phase II, he was given unsanitary mattresses and, as a result, developed a painful, itchy rash.

During all three phases, Appellant was confined to his cell for 22 hours per day.  He experienced bright lighting in his cell from 5:45am to 11:30pm, which interfered with his sleep.  He was not permitted to cover the lights in any way.  And during Phases II and III, Appellant had to request a form from correctional officers and then submit that form to seek permission to use money from his trust account to purchase personal items from the canteen. The RDU policies Appellant specifically references in his complaint indicate that during his placement in the RDU, Appellant was allowed two pencils, one pack of colored pencils, two pens, one pad or 25 sheets of paper, envelopes, ten cards, 25 pictures, personal hygiene items, two soft cover books or magazines, two newspapers, certain religious items, a radio and earbuds, and a deck of cards.  *See* Response Br. Addendum at 14–15

(reproducing RDU Phase I – D Policy Ch. III § 5404(k)(7)).  The policies also indicate that Appellant was provided a television.  *See id.* at 24 (reproducing RDU Phase I – D Policy Ch. III § 5404(z)).  Appellant's complaint does not allege that these policies were ineffective in practice, except that he does allege the library cart for books and magazines was not available while he was housed in the RDU.

Appellant graduated from the RDU on April 4, 2019, and was transferred to a different North Carolina correctional institution.

C.

The Conditions in General Population

According to Appellant, the conditions in the RDU were "substantially more restrictive and inhumane than those in general population, especially during phases IA and IB."  J.A. 17.  Appellant alleges that prisoners in general population are "ordinarily only expected to be in their cells overnight and during count times, and are able to move around to different locations such as dayrooms, dining halls, religious services, the canteen, and outdoor and indoor recreation spaces."  *Id.*  In addition, Appellant alleges that prisoners in general population are not tethered to tables during group activities; receive one contact or non-contact visit weekly; receive substantially more recreation time including the ability to play team sports; and are permitted to eat their meals out of their cells, with other prisoners, for more than twenty minutes.

8

D.

Procedural History

On February 26, 2021, Appellant filed suit in the Western District of North Carolina, alleging that Appellees violated his Fourteenth Amendment right to due process. Appellees filed a motion to dismiss arguing that Appellant failed to state a claim and that they were entitled to qualified immunity. The matter was referred to a magistrate judge for a memorandum and recommendation. The magistrate judge recommended dismissing the case for failure to state a claim or, alternatively, on the basis of qualified immunity. The district court overruled Appellant's objections, accepted the magistrate judge's recommendation, and dismissed Appellant's complaint.

Appellant timely noted this appeal.[4]

II.

We review the grant of a motion to dismiss for failure to state a claim de novo. *Benjamin v. Sparks*, 986 F.3d 332, 351 (4th Cir. 2021). Importantly, at this stage of the litigation, we "assum[e] as true the complaint's factual allegations and we construe all reasonable inferences in favor of [Appellant]." *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 80 F.4th 466, 472 (4th Cir. 2023) (internal quotation marks omitted) (first alteration in original).

---

[4] Because we determine that Appellant failed to state a claim, we do not consider Appellees' claims of qualified immunity.

III.

The Fourteenth Amendment provides that "[n]o State shall deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV § 1. Thus, despite the fact that "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights,' . . . a prisoner's liberty does not disappear entirely." *Thorpe v. Clarke*, 37 F.4th 926, 942 (4th Cir. 2022) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)). Rather, "[i]n our Circuit, prisoners retain a liberty interest in avoiding confinement conditions that impose 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life,' provided they can first establish that interest 'arise[s] from state policies or regulations.'" *Id.* (quoting *Incumaa* v. *Stirling*, 791 F.3d 517, 526–27 (4th Cir. 2015)) (second alteration in original); *see also Prieto v. Clark*, 780 F.3d 245, 252–53 (4th Cir. 2015). Because we find it conclusive, we focus our analysis only on whether the conditions Appellant alleges imposed an "atypical and significant hardship" such that due process protection may be warranted here.

A.

To determine whether the alleged conditions imposed an atypical and significant hardship, we must first determine the "baseline" for comparison. In cases like this one, where the plaintiff is an "inmate[] who [was] sentenced to confinement in the general prison population and ha[s] been transferred to security detention while serving [his] sentence," "general population is the baseline for atypicality." *Incumaa*, 791 F.3d at 527. Then, with that baseline established, we determine whether the alleged conditions

10

"constitute[] atypical and significant hardship in relation to the general population." *Id.* at 529 (citations omitted).

The Supreme Court illuminated the atypicality standard in *Wilkinson v. Austin*, 545 U.S. 209 (2005). There, the petitioners were assigned to a "supermax"[5] facility in Ohio based on the prison's evaluation of the security risks they posed. The petitioners alleged that they were held in seven by fourteen foot cells for 23 hours each day; the lights remained on at all times, though they were sometimes dimmed, and inmates were not allowed to cover them; and they received one hour of recreation per day in an indoor recreation cell. *Id.* at 214. In deciding whether the alleged conditions imposed an atypical and significant hardship, the Court emphasized three factors in its analysis: "(1) the magnitude of confinement restrictions; (2) whether the administrative segregation is for an indefinite period; and (3) whether assignment to administrative segregation had any collateral consequences on the inmate's sentence." *Incumaa*, 791 F.3d at 530 (citing *Wilkinson*, 545 U.S. at 214).

As for the first *Wilkinson* factor, the Court found that incarceration in the supermax facility was "synonymous with extreme isolation" because "every aspect of an inmate's life [was] controlled and monitored" and inmates were "deprived of almost any environmental or sensory stimuli and of almost all human contact." 545 U.S. at 214. Second, because inmates were confined to the supermax facility for an indefinite period,

---

[5] "Supermax facilities are maximum-security prisons with highly restrictive conditions, designed to segregate the most dangerous prisoners from the general prison population." *Wilkinson v. Austin*, 545 U.S. 209, 213 (2005).

their interest in receiving meaningful procedural review was magnified. *See id.* at 224. And third, assignment to the supermax facility "disqualifie[d] an otherwise eligible inmate for parole consideration." *Id.* The Court concluded, "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.*

As we have explained, applying the *Wilkinson* factors is a "'necessarily . . . fact specific' comparative exercise." *Incumaa*, 731 F.3d at 527 (quoting *Beverati v. Smith*, 120 F.3d 500, 502–03 (4th Cir. 1997)). We have conducted that comparative exercise in several published cases that inform our analysis.

First, consider *Incumaa*. There, the appellant had been held "in solitary confinement for 20 years, despite not having committed a single disciplinary infraction during that time." *Incumaa*, 791 F.3d at 519. He alleged that he was subject to "near-daily cavity and strip searches"; "confin[ed] to a small cell for all sleeping and waking hours, aside from ten hours of activity outside the cell per month"; unable to socialize with other inmates; and denied educational, vocational, and therapy programs. *Id.* at 531. We held that the appellant's confinement in those conditions for 20 years imposed an atypical and significant hardship sufficient to establish a liberty interest. Indeed, we noted that the conditions there were "worse in some respects" than the conditions the Supreme Court held created the liberty interest in *Wilkinson*, because the appellant was "subject to a highly intrusive strip search every time he le[ft] his cell." *Id.* at 531.

Similarly, we concluded the alleged conditions of confinement in *Smith v. Collins*, 964 F.3d 266 (4th Cir. 2020), were sufficiently atypical and harsh to establish a liberty

12

interest. There, the appellant alleged that he was confined for over four years "alone in a nine-by-fourteen-foot cell for twenty-four hours per day on non-recreation and non-shower days. *Id.* at 272. He was only permitted to leave his cell for showers three times per week and for recreation in a small, fenced cage five times per week, though recreation was frequently canceled. *Id.* Each time he left his cell, he was subjected to a highly invasive strip search, and he remained in shackles. *Id.* at 272–73. He was required to eat his meals alone in his cell, and almost all human contact was prohibited except for two brief phone calls per month. *Id.* at 273. Visitation, when provided, was through glass walls. *Id.* The cell door was solid metal and outfitted with metal strips to prevent communication with other prisoners. *Id.* The lights remained on in the appellant's cell at all times, dimming only at night, and he faced further discipline if he attempted to cover the light in an effort to sleep. *Id.* The appellant was also unable to participate in rehabilitation programs. *Id.*

In *Smith*, we held that these conditions were much the same as those in *Wilkinson*, which the Supreme Court had described as "synonymous with extreme isolation." *See* 964 F.3d at 276 (quoting *Wilkinson*, 545 U.S. at 214). While we noted that the duration of four years was substantially shorter than the duration of confinement in *Wilkinson* and *Incumaa*, we explained that the magnitude of the conditions was "significant enough to tip the scales in [the appellant's] favor." *Smith*, 964 F.3d at 269. In particular, we noted that, like in *Incumaa*, the conditions "may have been worse in some respects, due to the highly intrusive [strip] search." *Id.* at 276.

Most recently, in *Thorpe*, we concluded that the alleged conditions of confinement at two supermax facilities in Virginia were sufficient to establish a liberty interest. 37 F.4th

13

at 942–43. The appellants there had been held in the supermax facilities for as long as 24 years, and they alleged that the Virginia Department of Corrections provided no "genuine opportunity to progress though the program" and return to less restrictive confinement. *Id.* at 943. The appellants alleged they were confined to their cells for 22 hours per day; held in cells with steel doors and opaque windows that "halt[ed] communication with others" and "obscure[d] not just the outside but even the inside of the prison"; allowed one hour of exercise per day in a small cage; allowed one hour of non-contact visitation per week; denied access to any productive activities; and required to submit to a strip search every time they left their cells. *Id.* at 931. On top of those conditions, the appellants alleged they were not permitted to earn good time credits or could only earn them at a much reduced rate, and they were not eligible for parole. *Id.* at 932. We held that the harshness of these conditions had been clearly established because they were "even more onerous than" those in *Wilkinson*. *Id.* at 942.

### B.

As explained above, Appellant alleges that he was held in the RDU for 398 days. During that time, Appellant alleges that he was held in his cell for 22 hours per day and that the cell was brightly illuminated from 5:45am to 11:30pm each day. He also alleges that the library cart was unavailable for the duration of this stay in the RDU, and that he had to request a form from correctional officers in order to access his trust account.

The remainder of Appellant's allegations about his conditions are limited to his time in Phases I and II which lasted 138 days and 184 days, respectively. In Phase I Appellant alleges he (1) received one hour of recreation, five days per week; (2) received his meals

14

alone in his cell and had only 20 minutes to eat; (3) was allowed only one non-contact visit per month; (4) was not permitted to make phone calls at all for the first sixty days, and then was allowed one fifteen minute call every thirty days; and (5) was shackled to a table for weekly group classes. In Phase II, Appellant alleges that he was permitted an additional non-contact visit, for a total of two per month.[6]

Considering these allegations, we conclude that the first *Wilkinson* factor weighs slightly against Appellant because the conditions he alleges are less restrictive than those in *Wilkinson*. For example, the lights in Appellant's cell were on from 5:45am to 11:30pm, rather than 24 hours per day like in *Wilkinson* and *Smith*. Appellant was permitted outdoor recreation for one hour per day five days per week, rather than being restricted to indoor recreation. And he was able to attend weekly group classes, indicating that his human contact was not as limited as in *Wilkinson*. To be sure, the conditions Appellant alleges are restrictive, but they are less so than those we have previously considered to be of sufficient magnitude.

As to the second *Wilkinson* factor, though Appellant alleges that his confinement in the RDU could have been indefinite, we know that it lasted only 398 days. That does not

---

[6] The complaint does not indicate how Appellant's conditions changed otherwise after he was promoted out of Phase I. But because the complaint separates the allegations by phase and pleads specifically that the conditions in the RDU "are substantially more restrictive and inhumane than those in general population, *especially during phases IA and IB*," J.A. 17, we assume that Appellant's conditions otherwise improved with respect to the facts alleged only in reference to Phase I.

15

come close to the 20 plus years alleged in *Wilkinson*, *Incumaa*, and *Thorpe*. And although the duration in *Smith* was only four years, the conditions alleged there were substantially worse because the appellant was subject to a highly intrusive strip search each time he left his cell, his lights remained on 24 hours per day, and he was unable to participate in rehabilitative programs.

While Appellant alleges that his confinement could have been indefinite because NCDPS policies do not provide a maximum amount of time an inmate could be held in the RDU, Appellant's complaint also alleges that prisoners have spent "up to four years in the RDU." J.A. 11. Thus, this case is unlike *Thorpe* where the 24 year duration supported the appellants' allegation that the Virginia Department of Corrections provided no "genuine opportunity to progress though the program." 37 F.4th at 943. To the contrary, the facts here indicate that prisoners in the RDU do progress through the program, and that Appellant progressed through it in almost the minimum time possible. On these facts, we conclude that the second factor weighs against Appellant.

Finally, as to the third *Wilkinson* factor, Appellant has not alleged any collateral consequences to his sentence as a result of his placement in the RDU.

We recognize that Appellant's conditions, especially in Phase I, were more restrictive than those in the general population. But Appellant only experienced the harshest set of conditions for the 138 days he spent in Phase I, and his conditions of confinement improved for the remainder of the 398 days he spent in the RDU. And, even at their worst, the conditions here were not of the magnitude we have previously held sufficient to establish a liberty interest. Therefore, we do not find that Appellant's

16

placement in the RDU created an atypical and significant hardship in relation to the general population sufficient to establish a due process liberty interest.

IV.

Because Appellant has not established that his conditions of confinement created an atypical and significant hardship, the district court's dismissal of his complaint is

*AFFIRMED.*